UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHORE-LINE CARPET SUPPLIES, INC., on Behalf of Itself and all Others Similarly Situated, | Case No. 3:10-cv-00384 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| HICKORY SPRINGS MANUFACTURING COMPANY, VALLE FOAM INDUSTRIES, INC., DOMFOAM INTERNATIONAL, INC., THE CARPENTER COMPANY, THE WOODBRIDGE GROUP, FLEXIBLE FOAM PRODUCTS, INC., SCOTTDEL INC., FOAMEX INNOVATIONS, INC., FUTURE FOAM, INC., VITAFOAM PRODUCTS CANADA LIMITED, AND VITAFOAM, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Shore-Line Carpet Supplies, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated, brings this action for treble damages and costs of suit under Section 1 of the Sherman Act and Section 4 of the Clayton Act against Hickory Springs Manufacturing Company, Valle Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge Group, Flexible Foam Products, Inc., Scottdel Inc., Foamex Innovations, Inc., Future Foam, Inc., Vitafoam Products Canada Limited, and Vitafoam, Inc., (collectively, "Defendants"), and alleges, on information and belief, but on personal knowledge, as to allegations relating to Plaintiff, as follows:

NATURE OF CLAIM

1. This case arises from an unlawful conspiracy among producers of polyurethane foam to fix prices of polyurethane foam and polyurethane foam products ("Polyurethane Foam")

sold in the United States and elsewhere, and allocate customers, from at least 1999 through the present, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

2. As a result of this illegal conspiracy, Defendants charged supra-competitive prices for Polyurethane Foam sold in the United States and elsewhere, thereby injuring Plaintiff and members of the proposed Class (defined below).

## JURISDICTION AND VENUE

3. This action arises under Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 and 15.

4. This Court has jurisdiction under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. §§ 1331 and 1337.

5. Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants reside, transact business, are found, or have agents in this District. Further, a substantial part of the events or omissions giving rise to the claims alleged occurred in the District. Also, because Defendants Valle Foam Industries, Inc., Domfoam International, Inc., The Woodbridge Group, Vitafoam Products Canada Limited, Vitafoam, Inc. are Canadian corporations or business entities, venue in this District is proper under 28 U.S.C. § 1391(d).

6. The Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Polyurethane Foam throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the reasonably foreseeable and intended effect of causing injury to persons residing in, located in, or doing

business throughout the United States, including in this District. The claims alleged arise out of each Defendant's transaction of business and other activities in this District.

## PARTIES

7. Plaintiff Shore-Line Carpet Supplies, Inc. ("Plaintiff") is a Florida corporation with its principal place of business in Hollywood, Florida. During the Class Period (defined below), Plaintiff purchased Polyurethane Foam directly from one or more Defendants and was damaged as a result of Defendants' unlawful conduct.

8. Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation headquartered at 235 2nd Avenue, NW, Hickory, NC 28601. During the Class Period, Hickory Springs manufactured and sold Polyurethane Foam throughout the United States.

9. Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation, headquartered at 4 West Dr., Brampton, ON L6T 2H7, Canada. During the Class Period, Valle manufactured and sold Polyurethane Foam throughout the United States.

10. Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, headquartered at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C, Canada. During the Class Period, Domfoam manufactured and sold Polyurethane Foam throughout the United States.

11. Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company headquartered at 5016 Monument Avenue, Richmond Virginia, 23230. During the Class Period, Carpenter manufactured and sold Polyurethane Foam throughout the United States.

12.     On or about July 27, 2010, the Federal Bureau of Investigation ("FBI") raided the offices of Defendant Carpenter as part of a federal government probe into pricing practices related to Polyurethane Foam.  On or about that same day, the European Commission ("EC") raided the offices of several Polyurethane Foam manufacturers.  Carpenter was one of the targets of the EC raids as well.

13.     Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation headquartered at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada. During the Class Period, Woodbridge manufactured and sold Polyurethane Foam throughout the United States.

14.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated company headquartered at 12575 Bailey Road, Spencerville, Ohio 45887.  It also operates in Texas, Indiana, Florida and Wisconsin.  Flexible Foam is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  During the Class Period, Flexible Foam manufactured and sold Polyurethane Foam throughout the United States.

15.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation headquartered at 400 Church Street, Swanton, Ohio 43558. During the Class Period, Scottdel manufactured and sold Polyurethane Foam throughout the United States.

16.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company headquartered at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2076. During the Class Period, Foamex manufactured and sold Polyurethane Foam throughout the United States.

17. Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company headquartered at 1610 Avenue N, Council Bluffs, IA 51501. During the Class Period, Foamex manufactured and sold Polyurethane Foam throughout the United States.

18. Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company headquartered at 150 Toro Road, North York, Ontario M3J 2A9, Canada. During the Class Period, Vitafoam manufactured and sold Polyurethane Foam throughout the United States.

19. Defendant Vitafoam, Inc. ("Vitafoam, Inc.") is a privately owned and operated company headquartered at 2215 Shore Drive, High Point, NC 27263. During the Class Period, Vitafoam, Inc. manufactured and sold Polyurethane Foam throughout the United States.

20. Collectively, Vitafoam Canada and Vitafoam, Inc. are referred to as "Vitafoam." Vitafoam was acquired by Flexible Foam in 2006.

21. Various companies and individuals, engaged in producing and selling Polyurethane Foam in the United States, not named as Defendants in this Complaint, also participated as co-conspirators in the acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

## INTERSTATE TRADE AND COMMERCE

22. During the Class Period, Defendants and the unnamed co-conspirators sold and shipped Polyurethane Foam in a continuous and uninterrupted flow of interstate and foreign commerce to customers located in states and countries outside the state of origin of the shipments. In addition, payments for such Polyurethane Foam are made in interstate and foreign commerce.

23. During the Class Period, the business activities of Defendants and their co-conspirators in connection with the manufacture and sale of Polyurethane Foam were within the flow of, and substantially affected, interstate and foreign trade and commerce.

## THE RELEVANT MARKET

24. The relevant product market is Polyurethane Foam, a type of foam consisting of polymers made of a chain of organic units joined by urethane (carbamate) links, used to insulate objects or reduce shock. The relevant geographic market is at least the United States.

25. Polyurethane Foam is used in a wide variety of products, including the following: mattresses, pillows, and other bedding products; furniture, including seat cushioning and carpet cushioning; automotive products, including car cushions and car interiors; sponge foam blocks; shipping products, including shipping pads and cushions; medical devices and toys.

26. Customers that purchase Polyurethane Foam include furniture and bedding manufacturers, packaging companies, carpeting manufacturers and retailers, children's toy manufacturers and retailers, chemical companies, automotive and tire companies, and medical suppliers.

## THE CONSPIRACY

27. This case involves a conspiracy to suppress and eliminate competition by fixing, raising, maintaining and/or stabilizing prices of Polyurethane Foam and allocating customers for the sale of Polyurethane Foam in the United States and elsewhere.

28. Defendants conspired to fix, raise, maintain, and/or stabilize prices of Polyurethane Foam and allocate customers from January 1, 1999 through the present.

29. As alleged herein, during the Class Period, Defendants agreed to raise and fix the price of Polyurethane Foam at above-market levels. Also during the Class Period, Defendants agreed to allocate customers of Polyurethane Foam.

30. As a result of Defendants' conspiracy, Plaintiff and the Class paid artificially-inflated and noncompetitive prices for Polyurethane Foam.

31. On or about July 27, 2010, the FBI raided the offices of Defendant Carpenter as part of a federal government probe into pricing practices related to Polyurethane Foam.

32. Carpenter confirmed the investigation, saying: "In connection with a multi-jurisdiction investigation of the pricing practices to [sic] polyurethane foam products, the U.S. government has required that manufacturers of polyurethane foam, including Carpenter Co., produce information and documents. Carpenter Co. is being fully responsive and cooperative with the government to facilitate their review."

33. On or about that same day, the EC raided the offices of several Polyurethane Foam manufacturers. Carpenter confirmed that it was also a target of the EC raids.

## Effects of the Conspiracy

34. As a result of Defendants' unlawful conspiracy, prices for Polyurethane Foam have been fixed, raised, maintained, and/or stabilized in the United States and elsewhere during the Class Period.

## OTHER MARKET FACTORS SUPPORT THE EXISTENCE OF THE CONSPIRACY

35. Various other market factors make the Polyurethane Foam market susceptible to anticompetitive practices and unlawful collusion.

### Significant Barriers To Entry

36.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

37.     There are significant barriers to entry in the Polyurethane Foam market. Entry requires, among other things, that a company incur significant start-up capital expenditures, including those needed for manufacturing facilities, and significant investment in a distribution network.

38.     Existing manufacturers have established relationships with upstream suppliers and downstream purchasers, and can negotiate lower prices for raw materials and term contracts with major customers. Without these contacts, new entrants would face significant hurdles to afford inputs and secure customers.

39.     Additionally, the industry has been consolidating rather than attracting new entrants. Defendants have acquired smaller Polyurethane Foam manufacturers over the course of the past decade. For example:

(a)     Defendant Carpenter acquired its European competitor, Dumo NV, in 2007, increasing its market share to 16.3%; and

(b)     In 2006, Flexible Foam acquired Vitafoam. At that time, Vitafoam sold two plants to Woodbridge and Hickory Springs.

### Inelastic Demand

40.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small, decline in the quantity sold of that product, if any. In

other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

41. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

42. Demand for Polyurethane Foam is relatively inelastic. According to the Polyurethane Foam Association ("PFA"), alternatives for Polyurethane Foam have "poor height recovery characteristics after compression" and require additional insulation of springs. Therefore, the PFA states, "[c]omparing [Polyurethane Foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute…"

43. Polyurethane Foam from outside of the relevant geographic market does not serve as a substitute to U.S. Polyurethane Foam, since Polyurethane Foam is heavy and therefore expensive to ship across long distances.

## Standardized Product With High Degree Of Interchangeability

44. The PFA recognizes Polyurethane Foam as a commodity, which is interchangeable across manufacturers.

45. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

### Opportunities to Conspire

46. Defendants are members of trade associations, including the PFA, International Sleep Products Association, and others.

47. Approximately 70% of U.S. Polyurethane Foam manufacturers are PFA members.

48. During trade association meetings – including PFA meetings – Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

### ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

49. In forming and effectuating their conspiracy, Defendants and their unnamed co-conspirators engaged in anticompetitive practices, the purpose and effect of which were to artificially raise, fix, stabilize and/or or maintain the price of Polyurethane Foam sold in the United States and elsewhere. These activities included:

(a) Attending meetings or otherwise engaging in discussions and communications, face-to-face and by telephone, facsimile and electronic mail, regarding the sale of Polyurethane Foam in the United States and elsewhere;

(b) Agreeing during those meetings, discussions and communications to sell Polyurethane Foam at collusive, artificially-inflated and noncompetitive prices;

(c) Allocating customers of Polyurethane Foam in the United States and elsewhere; and

(d) Concealing the conspiracy and conspiratorial contacts through various means.

50. Defendants' unlawful conspiracy had and is having the following effects, among others:

(a) Price competition in the sale of Polyurethane Foam has been restrained, suppressed, and/or eliminated in the United States and elsewhere;

(b) Prices for Polyurethane Foam sold by Defendants and their co-conspirators have been fixed, raised, stabilized and/or maintained at artificially high, non-competitive levels in the United States and elsewhere; and

(c) Customers who purchased Polyurethane Foam directly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

51. By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the Class have sustained injury to their business or property in amounts to be proven at trial. The injury sustained by Plaintiff and the Class is the payment of artificially-inflated prices to Defendants for Polyurethane Foam during the Class Period. This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## FRAUDULENT CONCEALMENT

52. During the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their participation in the conspiracy alleged by holding themselves out as competitors to the public, to Plaintiff, and to the Class. Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiff and the Class could not have discovered the existence of this conspiracy prior to the public disclosure of the FBI and EC raids heretofore alleged.

53. Defendants and their co-conspirators wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to, secret meetings, misrepresentations to their customers concerning the reasons that they refrained from accepting or bidding for certain customers, and concerning prices charged for Polyurethane

Foam and surreptitious communications among Defendants and their co-conspirators by the use of the telephone, in-person meetings or trade association gatherings (and elsewhere) in order to prevent the existence of written records, limit any explicit reference to competitor pricing communications on documents, and to conceal the existence and nature of their competitor pricing discussions from non-conspirators.

54. Defendants and their co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

55. Defendants and their co-conspirators' purported reasons for refraining from accepting or bidding for certain customers, and for their charging artificially-inflated prices for Polyurethane Foam, were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.

56. Plaintiff and members of the Class reasonably relied on the materially false or misleading explanations by Defendants for refraining from accepting or bidding for certain customers, and for their charging artificially-inflated prices for Polyurethane Foam. Plaintiff and members of the Class were led to believe that Defendants' actions were the result of normal competitive market forces, rather than the product of collusive activity by Defendants and their co-conspirators.

57. Defendants' pricing was designed to, and did, cause Plaintiff and the Class to accept Defendants' actions without undertaking further inquiry, as would any reasonable person under the circumstances. Even had such inquiry been undertaken, it would have proven futile because Plaintiff and members of the Class did not have access to contemporaneous information

that would have allowed them to evaluate whether Defendants' artificially-inflated prices for Polyurethane Foam were collusively set.

58. At the time, Plaintiff and members of the Class considered Defendants' artificially inflated prices for Polyurethane Foam during the Class Period to be both normal and legitimate. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legality of Defendants' prices for Polyurethane Foam.

59. Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature. At all relevant times and in all relevant respects, Plaintiff and other members of the Class exercised reasonable diligence.

60. Because of the active steps Defendants took, including fraudulent concealment of their conspiracy, to prevent Plaintiff and members of the Class from discovering the anticompetitive activities alleged in this complaint, Defendants are equitably estopped from asserting that Plaintiff and the Class's claims are time bared by the applicable statute of limitations.

61. The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiff and members of the Class as a result of the anticompetitive conduct alleged in this complaint.

## CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and the Class.

63. The Class is defined as:

> All persons or entities who purchased Polyurethane Foam directly from one or more of the Defendants or their co-conspirators in the

13

> United States at any time during the period January 1, 1999 until such time as Defendants' unlawful acts have ceased (the "Class Period"). Excluded from the Class are government entities, Defendants and their subsidiaries, parents, or affiliates, and Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

64. The Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade or the commerce involved, Plaintiff believes that the members of the Class are geographically dispersed throughout the United States, and that joinder of all members of the Class would be impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, Plaintiff believes that there are at least hundreds of members of the Class, and that their identities can be learned from Defendants' and their co-conspirators' books and records.

65. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class purchased Polyurethane Foam during the Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of Defendants and their co-conspirators. Plaintiff and members of the Class have sustained damage in that they paid artificially-inflated prices for Polyurethane Foam during the Class Period due to Defendants' conduct in violation of federal law as set forth herein.

66. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation.

67. Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants conspired to raise, fix, maintain or stabilize the price of Polyurethane Foam in the United States and elsewhere, which members of the Class purchased;

(b) the date the conspiracy began;

(c) the identities of the unnamed co-conspirators;

(d) whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the members of the Class and, if so, the proper measure of damages; and

(e) whether Defendants undertook actions to conceal their unlawful conspiracy.

68. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, will achieve substantial economies of time, effort and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

69. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical, rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for members of the Class, while substantial in the aggregate, are not great enough

individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

**COUNT ONE**

<u>VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND
SECTION 4 OF THE CLAYTON ACT</u>

70. Plaintiff incorporates by reference the preceding allegations.

71. Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act. The matters complained of are a *per se* antitrust violation.

72. The conspiracy consisted of a continuing agreement, understanding or concert of action between and among Defendants and their co-conspirators unreasonably to restrain trade and commerce. In furtherance of the conspiracy, Defendants fixed, raised, maintained, and stabilized prices, rigged bids, and allocated customers for the sale of Polyurethane Foam in the United States and elsewhere. Defendants' conspiracy is a *per se* violation of the federal antitrust laws.

73. Defendants' conspiracy, and resulting impact on the market for Polyurethane Foam, occurred in or affected interstate and foreign commerce of the United States.

74. As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injuries in that they have paid artificially-inflated prices for Polyurethane Foam that they purchased directly from Defendants during the Class Period.

16
Case 3:10-cv-00384   Document 1   Filed 08/17/10   Page 16 of 18

## RELIEF SOUGHT

Accordingly, Plaintiff demands judgment as follows:

A. That the unlawful conspiracy alleged in this Complaint be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

B. That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

C. That Plaintiff and the Class recover the damages determined to have been sustained by them, trebled as provided by law, and that judgment be entered against Defendants, jointly and severally, on behalf of Plaintiff and each and every member of the Class;

D. Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

E. That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F. That the Court direct such other and further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: August 17, 2010

                                                  s/William E. Moore, Jr. _____
                                                  William E. Moore
                                                  **GRAY, LAYTON, KERSH, SOLOMON,**
                                                  **SIGMON, FURR & SMITH PA**
                                                  516 South New Hope Road
                                                  P.O. Box 2636
                                                  Gastonia, NC 28053-2636
                                                  Tel: (704) 865-4400
                                                  Fax: (704) 866-8010
                                                  bmoore@gastonlegal.com

                                                  *Local Counsel for Plaintiff*

                                                  Bernard Persky
                                                  Hollis L. Salzman
                                                  Kellie Lerner
                                                  Morissa R. Falk
                                                  **LABATON SUCHAROW LLP**
                                                  140 Broadway
                                                  New York, NY 10005
                                                  Tel: (212) 907-0700
                                                  Fax: (212) 818-0477
                                                  bpersky@labaton.com
                                                  hsalzman@labaton.com
                                                  klerner@labaton.com
                                                  mfalk@labaton.com

                                                  *Counsel for Plaintiff*